E-FILED
Friday, 14 September, 2012 11:17:05 AM
Clerk, U.S. District Court, ILCD

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| KENNETH CLARKE | ) | Case No. 12-6410 |
| | ) | |
| *Defendant(s)* | ) | |

FILED
SEP 14 2012
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 2011 through the present__ in the county of __Rock Island__ in the __Central__ District of __Illinois, and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) | Conspiracy to Distribute Marijuana: That on or about the dates alleged above, and in the locations alleged above, the defendant, Kenneth Clarke, did conspire with persons known and unknown to commit an offense under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), that is, to knowingly and intentionally distribute and possess with intent to distribute at least 100 kilograms of a mixture and substance containing a detectible amount of marijuana, a Schedule I controlled substance. |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

s/Matthew Allers

*Complainant's signature*

Matthew Allers, Task Force Officer, DEA

*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 14, 2012

s/Thomas J. Shields

*Judge's signature*

City and state: Davenport, Iowa

Hon. Thomas J. Shields, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, the affiant MATTHEW ALLERS, being duly sworn under oath, depose and state:

### INTRODUCTION

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), and have been so employed for approximately five years. I have been employed by the Iowa Department of Public Safety as a state police officer for over eleven years, and assigned to the Iowa Division of Narcotics Enforcement with the Department of Public Safety as a Special Agent for over seven years. During this time frame, I have participated in numerous narcotics investigations involving the distribution and transportation of controlled substances, manufacture of controlled substances, and sales of controlled substances. I am aware of the information set forth below through observations, discussions with other law enforcement officers, and a review of law enforcement reports. The following contains some, but not all, of the information known to me through this investigation.

2. I make this Affidavit pursuant to Rules 3 and 4 of the Federal Rules of Criminal Procedure in support of a criminal complaint charging KENNETH CLARKE with a conspiracy to distribute marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B), and for an arrest warrant to arrest said individual.

3. Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B) make it a federal crime to, among other things, conspire with others to distribute marijuana.

4. The elements constituting a violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B), are: 1) a conspiracy to distribute and possess with the intent to

distribute at least one-hundred (100) kilograms of marijuana existed, and 2) said individual knowingly became a member of the conspiracy with the intent to further the conspiracy.

## STATEMENT OF PROBABLE CAUSE

Information from the Arrest of a Drug Courier in the Central District of Illinois:

5. On or about December 8, 2011, an Illinois State Trooper stopped a black GMC Envoy, which was driving eastbound on Interstate 80 in Henry County, Illinois, for traffic violations. During the course of the traffic stop, an Illinois State Police K-9 conducted a free air sniff and gave a positive alert for the presence of illegal drugs. During a subsequent search of the vehicle, Troopers found approximately 145 pounds of suspected marijuana concealed within two kayaks which were secured to the roof of the vehicle. The driver and sole occupant of the vehicle, a known person referred to herein as the Courier, was detained and transported to the Geneseo, Illinois, Police Department for questioning.

6. During a post-arrest Mirandized statement at the police department, the Courier admitted that he was a courier for a marijuana trafficking organization. During his interview and in subsequent interviews with agents over the following days, agents learned the following about his involvement as a courier:

a. The Courier stated that he became a courier in approximately April of 2011 at the invitation of Kenneth Clarke. As a courier, he transported marijuana hidden in kayaks secured to his vehicle from California to Michigan and New Jersey at the direction of Clarke. The Courier added that, as a courier and at the direction of Clarke, he also picked up large amounts of United States currency, representing the proceeds from the distribution of marijuana, in New Jersey, Pennsylvania, and Michigan to return to Clarke and his associates in California.

b. The Courier estimated that he had made approximately seven trips to New Jersey since April of 2011 in order to deliver approximately one-hundred (100) pounds or more of marijuana per trip to an individual known to him as "P." The Courier stated he also picked up United States currency from an individual at a shoe store in Philadelphia on approximately two occasions—approximately $6,000 on one occasion and $175,000 on another—in order to deliver the money to Clarke in California. He also indicated that he delivered marijuana and picked up money at a location in Michigan on approximately three to four occasions.

c. The Courier stated that he had also been to Clarke's marijuana "grow site" in the mountains near Redwood Valley, California, on about four occasions when kayaks with marijuana secreted in them were secured to the Courier's vehicle. He added that he believed the property was owned by an individual that also owned a fertilizer company called "3D," which was located in Ukiah, California. He noted that on one occasion, three to four weeks prior to his arrest, he transported the $175,000 from Philadelphia (plus additional money be picked up in Michigan on the way to California) to Clarke at the fertilizer company. The Courier added that he watched Clarke and the owner of the company count the money, which totaled $281,000, in an upper room of the business. He remembered that he had been to the business on two prior occasions to meet Clarke and the owner of the business to deliver them currency. He stated on each of these occasions he observed Clarke and the owner count out the currency that he had transported back from the East Coast, and that on one occasion the currency totaled approximately $100,000, and on another occasion the currency totaled $70,000. He added that the currency was organized into several different stacks, as if for other people, as he was aware

through conversations with Clarke that other individuals had provided Clarke with marijuana which was transported and sold on the East Coast.

    d. The Courier said Clarke paid him approximately $10,000 for each trip, and usually communicated instructions to him regarding drop off or pick up locations over the phone. He said Clarke's phone number was (810) 333-6969.

Controlled Delivery to Pennsylvania, and Pick Up in New Jersey:

    7. On December 8, 2011, the Courier agreed to cooperate with law enforcement and participate in a controlled delivery of the marijuana he was transporting. To do so, he exchanged a series of recorded telephone calls with the person he identified as Clarke at (810) 333-6969. These phone calls took place from approximately December 8 to December 13, 2011, while the agents and the Courier traveled from the Central District of Illinois to the East Coast. The Courier's recorded phone calls with Clarke revealed the following:

    a. During one of the phone calls, the Courier asked Clarke for a delivery address. After a brief delay during which time others appear to be talking on Clarke's end of the phone, Clarke responded, "I'm talking to the dude right now." Clarke then directed the Courier to deliver the marijuana to "the same place you've been going, the shoe store." The Courier asked Clarke if he meant the location in New Jersey, and Clarke responded, "No, um, in PA—the shoe store." The Courier confirmed the address of the shoe store with Clarke over the phone, and confirmed with agents later that the shoe store was the same location that he had been to approximately twice before in Philadelphia to pick up money.

b. In a subsequent phone call, the Courier and Clarke discussed the phone numbers they should use to call each other. The Courier asked Clarke if Clarke's phone number ended in "2015." Clarke responded, "No, my number is (810) 333-6969."

c. In a subsequent phone call, Clarke provided the Courier with the phone number for "D," the person that the Courier was to meet at the shoe store. Clarke said D's phone number was "(267) 243-4926," and informed the Courier to call D to make the arrangements for the "drop and go."

d. In a later phone call, Clarke asked the Courier, "What are you doing tonight... cuz ah, our one buddy finished up. I was seeing if you could go north in ah, when you are done, when you get there, and just drop that and go. What are you doing afterwards?" The Courier responded that he was "going home." Clarke responded, "I was seeing if you could um, grab that hat up north and something else for me and something else for you." (Agent note: "hat" is believed to mean a kayak). The Courier said no, that he just wanted to go home. Clarke explained things further, but the Courier could not understand Clarke so Clarke clarified, "Well that orange hat that we left up top there." Clarke continued, "Alright, so, um, P's got fifty bucks for me, to finish me off finally, on that one thing... that ah, he's got ready to go for you if you stop by tonight and that other guy will have that chunk that I owe you..." The Courier asked, "Are we talking about P in Morristown?" (Agent note: the Courier was referring to an individual and a location in New Jersey that the Courier delivered marijuana to before). Clarke confirmed that they were, and that he "just talked to him, he's ah, he's got the fifty bucks that he owes me, which is cool because out of that I was going to pay you that ah, that ah, eight dollars and fifty cents that I owe you." (Agent note: the Courier indicated that "fifty bucks" means $50,000, and

Page 5 of 14

"eight dollars and fifty cents" means $8,500). Clarke also talked about "the guy next door," when the Courier and Clarke saw "C" "three weeks ago" and left an "orange hat" at the "storage unit," "right down the street from P."

e. Clarke subsequently called the Courier and asked him about his "holiday schedule" because Clarke had "something ready to go" and Clarke wanted to do it before Christmas. The Courier told Clarke that he would complete the current trip, but no more.

8. By December 13, 2011, the agents and the Courier had traveled nearly all the way to the shoe store in Philadelphia. At approximately 1:24 p.m., the Courier placed a recorded phone call to D using the phone number that Clarke provided to the Courier, (267) 243-4926. During this call, the Courier stated, "Um, am I gonna be ah, just dropping these off and finding the place or you want to go somewhere else or what . . . I've never done this with you guys before." D responded, "Well, did they give you the address to the store?" The Courier responded affirmatively, and thereafter the Courier and D agreed to meet at the store. Upon meeting at the store, D directed the Courier to D's house, where D accepted delivery of the marijuana from the Courier. Upon accepting the marijuana, agents arrested D, who was identified as Damon Lee.

9. After Damon Lee's arrest, the Courier called Clarke to inform Clarke that "it's all good," and to ask for the address for the next pick up in New Jersey with P. Clarke responded, "Okay, he said uh, I guess we aren't doing M-town, he said last time where he met you, and I don't know where that's at, he said at his parent's house." The Courier responded, "Yeah, I thought it was his brother's house, I don't remember." Clarke continued, "He wants you to call him so he can personally give you the address." The Courier asked for the phone number, and

Clarke responded, "Let me give you the latest one, hold on . . . (908) 230-6416." Clarke added, "Just give him a call, he'll tell you right where to come, he's waiting for you right now."

10. Later that afternoon on December 13, 2011, the Courier placed a recorded phone call to P at the phone number Clarke provided to the Courier in order to make arrangements for the pick up. P informed the Courier, "Go to where you went last time," and stated that the location is on "Balmoral" avenue. P confirmed that the Courier was picking up "fifty dollars," and that it was in a locked container and "crispier than it usually is." The Courier met P later than evening and accepted a locked toolbox from P containing approximately $41,000 in United States currency. Upon accepting the money, agents arrested P, who was identified as Pedro Pereira.

11. At approximately 7:45 p.m. on December 13, 2011, and after obtaining the $41,000 from Pedro Pereira, the Courier placed a recorded phone call to Clarke to confirm that the Courier had the money. Clarke said, "Mission Two complete, okay, you ready, Mission Three is the last one of the day." The Courier inquired, "You got another mission for me?" Clarke said yes, and then told the Courier, "We just gotta get that Orange Hat." The Courier asked, "So how's this going to work?" Clarke told the Courier to "stay overnight" and "wait for PA to get a chunk together and then come back." Clarke gave the Courier the option of getting the hat (kayak) tonight or in the morning. Clarke added that "the hat is not too far from where you are at now, and these guys in PA aren't going to be ready until like you know 1 or 2, maybe the latest 3, so I mean, you have the early afternoon to wake up, go get the hat, then possibly he'll have more loot for us, Mr. C., will have a little bit more loot, then you can go back down, do that, and then come back up, so ..." The Courier asked, "How do I get the hat tonight?" Clarke responded, "He's going to meet you there," and added, "Yeah, he'll meet you over there, and you guys can

both load it up, and then uh you know you're good to go, but right now, he's gotta collect, so he doesn't have..." The Courier interrupted and said, "So he doesn't have any money?" Clarke replied, "Scorilla, yeah, so if you wait until the morning, it will help us out a little bit with the hat guy." The Courier and Clarke then talked about hotel locations, and where they have been before, including the "Walmart Rockway," and that the "hat" is "right across the street" from there, and the "nice clean hotel" is just up the street. Clarke agreed to pay for the room and make arrangements, but the Courier did not understand. Exasperated, Clarke told the Courier, "We could be a lot more clear if I could fax you." The Courier asked, "Why can't you fax me on this phone?" Clarke responded, "because it is yours." Clarke then told the Courier that he was going to call the Courier's other phone.

12. Clarke, using a different phone number ((707) 391-2015), then called the Courier back and said, "Your other phone is not working, or the number I have is wrong. Okay, so listen, so I don't have to repeat myself three times." Clarke then told the Courier what the plan was, explaining that he was to stay at the hotel that night and then get the orange hat and money from "C" tomorrow in order to bring them back to Clarke in California. No more recordings were taken after this point, and the controlled operations were terminated.

Additional Investigation:

13. In subsequent meetings with the Courier, agents showed him a photograph of the office building for "3D Organic Solutions, LLC" located at 3450 North State Street in Ukiah, California. The Courier identified the business in the photograph as "3D Fertilizer Company," and as the place where he sometimes met Clarke. Agents also showed him a photograph of the person agents believed to be the owner of 3D Organic Solutions, LLC. (The website for the

company, www.3dorganicsllc.com, listed this person as Proprietor/General Manager. It also listed Clarke as the Special Operations Manager. The website currently states that it is "under maintenance.") The Courier identified the person as the owner, and that Clarke had told the Courier that this person was the owner of the business. The Courier stated that he had been to the business on about six to eight occasions to receive instructions regarding the delivery of marijuana and/or money, and that he had met the owner at the business about four or five times. One time, the Courier recalled, he met Clarke and the owner at the business and received $3,500 in cash from the owner as payment for bringing back money back to them from the East Coast. The Courier recalled that, on another occasion, the owner once told him that he should not worry if he ever got caught because they would obtain a lawyer for him and that he would only be imprisoned for a short time.

14. On January 24, 2012, agents interviewed an individual hereinafter referred to as Cooperating Individual One, (CI1). During said interview, CI1 disclosed that he was involved in the distribution of marijuana with Pedro Pereira and was aware that Pereira's source of marijuana was located in California. CI1 stated while involved in the distribution of marijuana with Pereira, CI1, at the direction of Pereira, sent what CI1 believed was money derived from the sale of marijuana to the source of the marijuana in California via UPS and Fed Ex. CI1 stated he had done this on at least five occasions and that he sent the packages to a person named K. Clarke. CI1 stated he was also collecting and holding currency owed to Pereira since Pereira was arrested by law enforcement. CI1 stated the currency was located at his residence and he would turn the currency over to the custody of law enforcement. Later that day, CI1 provided agents

with consent to search his residence. During the search of his residence agents seized $62,815.00, representing proceeds from the sale of marijuana that was owed to Pedro Pereira.

15. On March 8, 2012, agents interviewed an individual hereinafter referred to as Cooperating Individual Two (CI2). CI2 disclosed to agents that he was also involved in the distribution of marijuana with Pedro Pereira. CI2 stated that CI2, at the direction of Pereira, sent packages via UPS and Fed Ex containing currency to California. CI 2 stated he was paid $200.00 by Pereira to send the packages.

16. Agents also conducted a search of Pedro Pereira's cell phone pursuant to a federally authorized search warrant. During the search, agents located a photograph of a UPS shipping label from a UPS store in New Jersey addressed to "K. Clark" at "3450 N. State Street" in "Ukiah, CA." In addition, a search of Pedro Pereira's phone revealed text messages between Pedro and his brother, Jimmy Pereira, at phone number (908) 803-3663. In the text messages, Jimmy texted Pedro a Uniform Resource Locator (URL) on July 11, 2011, and asked Pedro if Pedro received the "link." Accessing the link, or URL, online showed a webpage revealing the UPS tracking results for a package with a specific tracking number that was delivered "next day air" to Healdsburg, California. UPS records confirmed that the package with that specific tracking number was shipped by a "P. Pereira" on July 8, 2011, in New Jersey to "K. Clarke" at a residential address of "289 Alexandria Dr." in "Healdsburg, CA," and that it was delivered on July 11, 2011. This UPS record and others revealed the following shipments via next day air to "K. Clark," "K. Clarke," or "Kenny Clark" from several persons and addresses in New Jersey (the names and addresses are as they appear on the records):

| Ship Date | To | Tracking # | Cost | Weight |
|---|---|---|---|---|
| May 3, 2011 | K. Clark<br>3450 N State St<br>Healdsburg, CA | 1ZE093Y60<br>117718230 | $178.74 | 7.15 lbs |
| May 12, 2011 | K. Clark<br>3450 N State St<br>Ukiah, CA | 1ZE093Y60<br>118394730 | $174.08 | 7.45 lbs |
| May 25, 2011 | K. Clark<br>3450 N State St<br>Ukiah, CA | 1ZE093Y60<br>119192189 | $236.99 | 6.7 lbs |
| May 26, 2011 | Kenny Clark<br>289 Alexandria Ct<br>Healdsburg, CA<br>Business | 1Z1206E00<br>117797455 | $118.24 | 3.75 lbs |
| June 22, 2011 | K. Clark<br>3450 N State St<br>Ukiah, CA | 1ZE093Y60<br>121074089 | $150.48 | 4.55 lbs |
| July 8, 2011 | K. Clarke<br>289 Alexandria Dr<br>Healdsburg, CA | 1ZE093Y60<br>122094985 | $178.59 | 6.8 lbs |
| Aug. 24, 2011 | K. Clarke<br>3450 N State St<br>Ukiah, CA | 1ZE093Y60<br>158642717 | $148.53 | 5.95 lbs |
| Sept. 9, 2011 | K. Clark<br>289 Alexandria Ct<br>Healdsburg, CA | 1ZE093Y60<br>126406130 | $102.09 | 3.15 lbs |
| Dec. 1, 2011 | K. Clarke<br>289 Alexandria Ct<br>Healdsburg, CA | 1ZAT37460<br>136202459 | $88.32 | 2.22 lbs |

An additional UPS record indicated that "Ken Clarke" shipped a package from an Atlantic City, NJ, UPS store as indicated below (the names and addresses are as they appear on the records):

| Ship Date | From | To | Tracking # | Cost | Weight |
|---|---|---|---|---|---|
| June 10, 2011 | Ken Clarke<br>289 Alexandria Dr<br>Healdsburg, CA | Alicia Clarke<br>289 Alexandria Ct<br>Healdsburg, CA | 1Z10332F01<br>06458419 | $105.01 | 5.15 lbs |

Agents believe Alicia Clarke is Ken Clarke's wife, and the AT&T subscriber information for the phone number that Ken Clarke used to call the Courier during the recorded phone calls, (810)

Page 11 of 14

333-6969, listed a female named Alicia with a different last name living at 289 Alexandria Court in Healdsburg, California, as the financially liable party, and that she had been a customer since November of 2004.

Fed Ex records also revealed the following shipments from the Pereiras in New Jersey to "Ken Clarke" or "K Clark" (the names and addresses are as they appear on the records):

| Ship Date | To | Tracking # | Cost | Weight |
|---|---|---|---|---|
| June 18, 2011 | Ken Clarke 289 Alexander Dr Healdsburg, CA | 874618356871 | n/a | n/a |
| Dec. 1, 2011 | K Clark 289 Alexandria Ct Healdsburg, CA | 876937249255 | n/a | n/a |

17. Agents continued their investigation in California to locate 3D Organic Solutions, LLC, and the marijuana "grow site" that the Courier had described.

18. On or about April 11, 2012, the Courier met with agents and directed them to 3D Organic Solutions, LLC, located at 3450 N. State Street in Ukiah, California. The Courier reiterated that this was the location where he had met the owner and Clarke for the purpose of providing them with currency that he had transported back from the East Coast.

19. On or about April 11, 2012, the Courier also directed agents to the grow site located at 14341 Tomki Road in Redwood Valley, California, which agents learned belonged to the owner of 3D Organic Solutions, LLC. Upon arriving at said location, agents observed the owner's residence and a dirt roadway leading up to and past the owner's residence. The address 14341 was on a sign affixed to a tree at the entrance to the roadway. The Courier directed agents to travel up the mountain past the owner's residence to the location of the grow site. Upon doing

so, agents observed what appeared to be a marijuana grow site containing an outbuilding, a concrete reservoir filled with water, a kayak on the property, tubing running along the ground to various locations, and areas which had been cleared away of brush and fenced off. The Courier informed agents that due to the hazardous roadway leading to the grow site, he had only been beyond the residence to the actual grow site on one occasion. The Courier stated when he had been taken to the grow site by Clarke, marijuana plants were being cultivated in the fenced in area. He stated that he had met with Clarke on numerous occasions at the bottom of the roadway to load the shipments of marijuana he was transporting onto the vehicle he was driving.

20. On or about August 27, 2012, and on or about September 7, 2012, agents conducted a flyover of the 14341 Tomki Road property in Redwood Valley, California. During the two flyovers, agents observed a cultivated marijuana grow site containing more than forty (40) growing marijuana plants.

21. As a result of this investigation, the Grand Jury for the Central District of Illinois indicted the Courier, Damon Lee, Pedro Pereira, and Jimmy Pereira. The Grand Jury indicted the Courier and Pedro Pereira in December of 2011 for a conspiracy to distribute at least one-hundred (100) kilograms of marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B). The Grand Jury subsequently and separately indicted Damon Lee in February of 2012 for a conspiracy to distribute marijuana, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B). Later, in May of 2012, the Grand Jury superseded the indictment against the Courier and Pedro Pereira to include Jimmy Pereira as a defendant in the same conspiracy.

## CONCLUSION

22. Based on the foregoing, I respectfully request that this Court find that this Affidavit sets forth probable cause supporting the criminal complaint charging KENNETH CLARKE with a conspiracy to distribute marijuana in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B), and that this Court issue an arrest warrant for the arrest of said individual.

Dated: September 14, 2012

By: s/Matthew Allers
Matthew Allers
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn to before me on September 14, 2012.
s/Thomas J. Shields

The Honorable Thomas J. Shields
United States Magistrate Judge
Central District of Illinois, Rock Island Division